## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**JOHN FITZGERALD,**

       **Plaintiff,**

**vs.**                          **Case No.: 8:21-CV-01017-SDM-JSS**

**CITY OF TAMPA,**

       **Defendant.**

_____/

### DEFENDANT'S MOTION TO DISMISS COMPLAINT

The Defendant, City of Tampa, moves pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint filed by the Plaintiff, John Fitzgerald, on the grounds that the complaint fails to state a claim on which relief may be granted under Title VII, 42 U.S.C. § 1981, or 42 U.S.C. § 1983. The Plaintiff claims that he was "demoted and transferred," "replaced," and ultimately constructively discharged on account of his race and in retaliation for his having opposed unlawful discrimination.

The Defendant includes with this motion documents which are not attached to or expressly incorporated into the complaint. But they are pled and summarized and  central to the Plaintiff's claims. The Defendant therefore contends that the Court may consider them as part of the complaint for purposes of this motion. Alternatively, the Defendant asks that the materials be considered as having been presented pursuant to Rule 12(d) of the Federal Rules of Civil Procedure.

<u>**MEMORANDUM**</u>

The complaint comprises five counts alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981, and 42 U.S.C. § 1983, and an independent claim for constructive discharge, all based on a common set of facts. Counts I and IV complain of discrimination based on race. Counts II and V on retaliation. Count III alleges a constructive discharge.

## I.    Introduction

While the Plaintiff complains of both discrimination and retaliation, his pleading does not allege a claim that an employee suffered discrimination, objected to that conduct, and then suffered a second adverse event because of the objection. The Plaintiff alleges that he was transferred from the District II training squad, an assignment which was at all times subject to the discretion of the Police Chief. That single transfer is the basis for the claims sounding in discrimination and retaliation. The Plaintiff alleges that he was transferred, (a) because the chief wanted to create a vacancy for an African-American employee, or (b) in retaliation for having complained of another African-American employee, a probationary officer, being allowed an "advantage" that had no impact on the Plaintiff or any other person. [1] He invokes both Title VII and 42 U.S.C. § 1981.

## II.    Legal Standard

To defeat a motion to dismiss for failure to state a claim, a plaintiff must plead

---

[1] A plaintiff cannot prevail in claims for discrimination and retaliation based on a single adverse employment action. Claims alleging retaliation must be proven according to traditional principles of but-for causation. <u>University of Texas Southwestern Medical Center</u>, 570 U.S. 338, 360 (2013).

enough facts to state a claim that is plausible on its face. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim has plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In reviewing a Rule 12(b)(6) motion, the Court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. The Court is not bound to accept legal conclusions. Iqbal, 556 U.S. at 679. The City emphasizes that the presumption required by law is limited to the Court's consideration of this motion.

When material outside a complaint is presented to and not excluded by the court, a motion to dismiss is to be treated as a motion for summary judgment and disposed of pursuant to Rule 56 of the Federal Rules of Civil Procedure. However, for purposes of a motion to dismiss, a complaint includes any document attached to it or incorporated by reference and, "[e]ven where a document is not incorporated by reference the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint. Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (internal quotations and citation omitted).

## III.    The Plaintiff's Allegations of Fact

John  Fitzgerald was employed by the City of Tampa Police Department ("TPD") from 2002 until 2019, in the positions of patrol officer, detective, and corporal. (Doc. 1 p 3, ¶¶12, 13, Id. 12-13, ¶76). He sues for a breach of his contract of

employment. At all times relevant to this suit and during all of Fitzgerald's employment, the terms and conditions of his employment, including compensation, assignment, transfer, and promotion, were defined and governed by a collective bargaining agreement between the City and the Police Benevolent Association ("CBA").[2] The CBA is therefore central to Fitzgerald's claims and when he refers to matters such as assignment, transfer and promotion, he refers to terms defined by the CBA. It is attached to this motion as Exhibit A.

Fitzgerald alleges that before 2019, he had worked as a patrol officer, detective (assigned to the internal affairs unit beginning in 2013) and field training officer. (Id., ¶ 14). As is explained more fully below, a Field Training Officer ("FTO") is a uniformed police officer who performs on-the-street training of new police officers, for which he or she is paid a monthly stipend for the performance of those additional duties in any month they are performed. FTO is an assignment, not a position. The positions of detective and corporal are identical in all respects except the nature of the duties performed. Those duties are determined by the officer's assignment. The CBA includes a pay plan. (Ex. A, Appx. A). The pay grade for detective is P-3, for police corporal P-4. While the grades are numbered differently, the wage, wage progression, number of steps in the progression, and the total compensation and benefits received (with the exception of a clothing allowance paid to officers serving as detectives but not uniformed officers) are identical between detective and corporal.

---

[2] The bargaining unit to which the agreement applied included "police officers, detectives, corporals, school resource officers, police aircraft pilots, sergeants and such other classifications or assignments as may be provided by law." (Ex. A, Art. 1.1).

So too are the requirements for attaining the two ranks and the process to be followed.

The CBA defines a promotion as, "a permanent elevation in rank from the classification of police officer to detective/corporal; or police detective/corporal to police sergeant[.]" (Ex. A, Ar. 35.1).[3] A police officer who is promoted to detective or corporal is not promoted again when he or she is assigned from one of those two classifications to the other. When Fitzgerald alleges that he "elected to leave Internal Affairs," where he had been assigned as a detective since 2013, to take a position "as a corporal" on the District II Training Squad, he does not allege a promotion (or a demotion because he would no longer receive a clothing allowance). (Doc 1, P 3, ¶ 15). And although he alleges that in this case that he was "demoted," all of the positions offered to him or that he expressed interest in after being transferred from the training squad were either corporal or detective positions. (Id., p 8, ¶¶43, 47). All of these positions would have paid him the same wage and provided the same benefits. Fitzgerald was not demoted.

Fitzgerald was transferred from the Training Squad. His assignment to that squad (pled as "in 2019") had been at the Police Chief's discretion.[4] The CBA defines the terms of that assignment, and all other "special payments":

---

[3] All promotions are accomplished "in a manner provided by the City's Civil Service Law," which requires that an employee be certified as eligible for the promotions sought. The ranks of detective and corporal are treated identically throughout that process. They take the same test for promotion. (Doc 1, Art. 35.3) ("There will be separate tests for the ranks of police detective/corporal, police sergeant, and police lieutenant").

[4] Fitzgerald alleges that he elected to leave IA and "take a position" on the [FTO Squad]. Specialty assignments are not offered. The contract provides that officers wishing "transfer or assignment" to a

> Employees assigned by the Chief of Police on a full-time basis as members of the Field Training Squad shall receive a special payment of $230 per month for any month during which the employee is responsible for training activities authorized by the Training Squad Sergeant in accordance with the Field Training Program. Payment shall be on a monthly basis. (Ex. A, Art. 30.4).

There are no prerequisites or minimum requirements for assignment to the training squad, in terms of seniority (beyond four years of employment with the Department), experience, or training.[5] The collective bargaining agreement provides a process by which officers may bid for their preferred division, squad, and shift, on the basis of seniority. Specialty squads, including the field training squads, are expressly exempted. There is no process for assignment or transfer.[6]  The officer is entitled to a payment of $230 per month (the same amount paid to any member of the squad, regardless of rank) but only for periods in which he or she performs training duty, and only for as long as the full-time assignment lasts. When Fitzgerald was transferred from the training squad he ceased getting the extra payment but he no longer had to perform training duties that are not part of the regular duties of a corporal.

As the corporal on the field training squad, Fitzgerald's immediate supervisor was Sergeant Liza Doane. He was "responsible for assisting Sergeant Doane with the daily operations of the squad, while insuring the Field Training Officers and

---

specialty squad may indicate their interest in response to a posted announcement of available openings. (Id., Art. 11.4.1(e))

[5] Or for any of the other specialty squads which include the bomb squad, hostage negotiations, tactical response, and dive teams, and the motorcycle unit. (Id., Art. 30)

[6] Three assignments are made a part of the pay plan: school resource officer, chief pilot, and flight supervisor. As to those particular assignments, the contract provides that "the assignment to or transfer from such positions shall be at the sole discretion of the chief of police. The chief of police shall meet, upon request of the employee, prior to a transfer or reassignment." (Id. Art. 35.2). There is no similar "process" provided for any other assignment.

Probationary Officers were in compliance with the program's guidelines." (Doc 1 p 3, ¶16). In August of 2019, one of those probationary officers (referred to in this motion as "P.O.") was struggling to advance through the training program. (Id., ¶¶17-18). Fitzgerald, "worked closely with [P.O.]" but despite his efforts, she had been unable to pass the third phase of her training. (Id., ¶¶18-22).

On August 6, 2019, Doane wrote a report regarding the probationary officer's performance, citing the need for a second extension of her training program to allow the officer to pass phase three and advance to the next phase. (Id., P 4, ¶¶22, 25). Fitzgerald alleges the report and characterizes its contents as recommending that the probationary officer receive remedial training as part of her shift assignment but "the report did NOT recommend that [the officer] undergo more intense scenario training with the Training Unit." (Id., ¶ 23). Fitzgerald's use of capitals indicates that Doane's report is central to his claims. It is therefore appropriate to consider the report in assessing the Complaint and it is attached as Exhibit B. Doan's actual words were:

> FTO will continue to work with [the officer] on her investigative techniques … [The officer] may also participate in scenario-based training focused on honing her investigative skills as well as other training tactics as needed to benefit her.
> This training will further assist her in her confidence level and ability to arrive at sound decisions within departmental policy …. This training plan is designed to be fluid and has the ability to be changed and/or modified with the needs of [the probationary officer] during her training. (Ex. B, emphasis added).

The only inference allowed from the sum of Fitzgerald's allegations of fact is that from August 6 until August 30, 2019, P.O. did not receive the training that was

part of her plan but she was nevertheless evaluated on every shift she worked, notwithstanding the training squad's failure or inability to schedule the training.

One week later, on August 13, 2019, Doane reviewed her report with P.O. (Id., ¶24). On August 19, 2019, Lt. Filippone, the training squad lieutenant and Doane's immediate superior, and Capt. Zambito, the head of the training squad, met with P.O. to review her performance. (Id., ¶26). In the meeting, P.O., "asked if she could undergo remedial scenario training with the Training Unit." The request was granted and the next day, August 20, 2019, Filippone ordered Doane to arrange for P.O. to attend the remedial training at the training unit. (Id., p 5, ¶27). That same day Doane ordered to schedule the training. (Id. ¶28).

Fitzgerald alleges that he called the training unit and left a message. (Id.). Having received no reply, he "followed up" with an email sent on August 22, 2017 and he and Doane informed the lieutenant that "they had been unable to schedule the training." (Id., ¶29). Five days later, on August 27, 2017, Fitzgerald recommended a third extension of the officer's phase three training, "to give her time to attend the training and improve her performance on the shift evaluations so she could pass the third phase" of her training. (Id., ¶30, emphasis added). The complaint's reference is to the training plan Fitzgerald authored on this date. The actual document, which is attached to this motion as Exhibit C, does in fact recommend a third extension of Phase III of P.O.'s, which is noted as expiring on August 28, 2017. Additionally, Fitzgerald wrote, "[P.O.] will take part in scenario based training and other training tactics that will seek to improve her overall, daily

8

performance, while developing her as a probationary officer." (Exhibit C). On August 28, 2017, Filippone, not Fitzgerald, contacted the training unit to schedule the remedial training. (Id., ¶31).

P.O. still had not received the training by August 30, 2017. Fitzgerald alleges that "P.O. was at risk of failing out of the Training Program if she received a low score on her shift set" for August 30, 2019. (Id., p. ¶32). Fitzgerald does not allege any facts which support this conclusion and, like Fitzgerald's interpretation of the training protocol's requirements for daily evaluation, it need not be taken as true. But the allegation serves as a clear acknowledgement of the facts that (1) Fitzgerald certainly could understand the training captain's motivation for his order to suspend P.O.'s daily evaluations, (2) P.O. had been evaluated every shift she worked since being expressly allowed scenario training at the training unit without having received that training, and (3) when Fitzgerald objected to the suspension of P.O.'s evaluations he did so knowing that he had just requested an extension for training that would improve P.O.'s performance and, at least in his mind, if P.O. received a low evaluation on August 30, 2019, she would be "at risk of failing out of the program" without ever having received the training.

Fitzgerald alleges that on August 30, 2019, Captain Stout, who replaced Zambito as head of the training squad on that day, asked P.O.'s FTO, "to cease all evaluations of [P.O.] until she attended remedial training at the Academy." (Id., ¶32, emphasis added). Stout then ordered Filippone that P.O. was not to be graded on a shift, "until she received the remedial training." (Id., emphasis added). Filippone

informed Doane and Fitzgerald of Stout's order that P.O. was not to be evaluated on her shift "until she received the remedial scenario training at the Academy" and "[a]t this point both Doane and Fitzgerald" objected to this course of action and told Filippone that "it was against the rules of the Field Training Program" to suspend daily evaluations of a probationary officer.[7] (Id. p 6, ¶35, emphasis added).

Fitzgerald alleges that the order to suspend evaluations for P.O. violated TPD field training protocol because, "to maintain the integrity of the training program it is essential under [the model used for TPD training] that all trainees are scored every shift they work." (Id., p 6, ¶33).[8]  Fitzgerald does not allege that the protocol was a law or regulation that bound the City or that the suspension violated any law prohibiting discrimination. He does allege that after being informed of the directive, both he and Doane "objected to the course of action" and told the lieutenant that it "was against the rules of the Field Training Program." They explained that all

---

[7]  In Counts III and V, alleging retaliation, Fitzgerald gives himself more credit, revealing that it was he who led the opposition to the suspension of evaluations. (Doc 1 P14, ¶87; P 19, ¶ 108) ("Upon learning of Stout's order to suspend [P.O.'s] evaluation, Fitzgerald objected and informed [Doane and Filippone] that this was a violation of protocol." (emphasis added). Fitzgerald alleges that he had been an FTO at an unstated time before 2012 and became the training squad corporal "in 2019," at most 8 months before he was rendering this opinion.

[8]  The Plaintiff's allegation that the suspension of a probationary officer's evaluations violates a Department protocol is a conclusion the Court need not accept. The facts alleged to support this conclusion are not plausible. Fitzgerald says that "allowing a probationary officer to temporarily avoid evaluations undermines the evaluation process and gives [the officer] an unfair advantage over other trainees" and "could allow an officer to graduate from the program without being adequately prepared to work on the streets." (Id., ¶34). The Plaintiff does not allege that probationary officers are ranked, compete with each other, or otherwise would be harmed by another officer's more lenient treatment any more than they would be harmed by the extensions granted to P.O. on the recommendations of Doane and Fitzgerald. Moreover, the order suspended the officer's evaluations, not the training she continued to receive during her shifts. After receiving remedial training the probationary officer would be evaluated. If she was found to be ready for the next phase she would go on, and if she did not meet the requirements for the training plan, she would not.

probationary officers had to be graded every day so that the training would be "fair and not compromised." (Id., ¶35). Filippone repeated that the suspension had been ordered by Stout and asked Doane if she wanted to speak directly to the captain. Saying that she did, she and the lieutenant called the captain. Fitzgerald did not attend the conference call but Filippone informed Stout of the objections "raised by Doane and Fitzgerald relating to [PO] being allowed to work an ungraded shift." (Id., ¶36).

"Just after midnight" on the morning of August 31, 2019, Stout arrived at the District II office. (Id., p 7, ¶ 38). In that meeting, at which Fitzgerald pleads himself as a bystander, he observed Stout reviewing documents with Doane. Stout "confronted" Doane about her position that the probationary officer should not have been allowed to work an ungraded shift. (Id., ¶39). Fitzgerald alleges that Stout "falsely alleged that District II had been failing all of the Black probationary officers and [Doane] [n]eeded to get on board with the Mayor's agenda to hire and promote more black police officers." (Id., p 7, ¶39). Doane allegedly denied the allegations. (Id.). Most importantly, regardless of what was or was not said, "After this meeting, [Doane] believed that [Stout] was going to transfer her out of District II and she said as much to [Fitzgerald]." (Id. p 7, ¶40).

The next day, September 1, 2019, Stout announced that Doane and Fitzgerald were being "demoted" from their positions as Field Training officers and "transferred out" of District II. In a telephone call two days later, Fitzgerald asked Stout "why he was being transferred." Stout answered that he "wanted to go in a

11

different direction." (Id., ¶42). Stout "admitted" that Fitzgerald had done nothing wrong and had no performance issue that "justified" the "demotion and transfer." (Id., ¶ 42). Stout said he would transfer Fitzgerald "to the corporal position for School Resource Officers in District II" (emphasis added) but Fitzgerald "did not want to work as a school resource officer corporal." (Id., ¶43).

On September 4, 2020, Fitzgerald met with Stout "to discuss the issue of where he was to be assigned." (Id. p 44). Instead, Fitzgerald says he asked again why he was being transferred. Stout is alleged to have responded that Fitzgerald "had done nothing wrong but [his transfer] was simply for the sake of diversity" and explained that "the Chief wanted more diversity on the FTO squad and that is why he was being transferred." (Id. P 45). Stout asked Fitzgerald where he wanted to be transferred. By Fitzgerald's telling, and notwithstanding the fact that they were meeting to discuss that very issue, Fitzgerald apparently was unprepared for that question, because "Stout told him to think about where he wanted to be transferred" and give Lt. Filippone a list "in order of his preference of the different districts." (Id., 46).

Fitzgerald provided the list to Filippone. He "placed District III at the bottom of his list because he was concerned that he could face retribution . . . for work he had performed while assigned to I.A." (Id., p 9, ¶47). As with the portrayal of his role in initiating resistance to allow a struggling probationary officer time to take remedial training without being evaluated, Fitzgerald pleads more strongly in his count alleging constructive discharge than in the portion of the pleading comprising

facts. In paragraph 76 of the complaint Fitzgerald alleges that his transfer to District III gave him no choice but to retire in order to avoid working in this "dangerous" environment. None of Fitzgerald's unsupported conclusions is entitled to a presumption of accuracy. One that is central to all of a plaintiff's claims (constructive discharge is an adverse action pled in each count of the complaint), alleges that physical harm would befall an officer for having been an internal affairs detective, and alleges that such an environment exists in the City demands a plausible explanation. The complaint does not provide one.

Filippone "sent an email to [Stout] . . . with Fitzgerald's list of preferences." A copy of that mail is attached to this motion and is properly considered. It does not place District III as his last choice. It does not mention the district at all:

> I already sent this to you via text, but I wanted to send it via email as well. I spoke with Corporal Fitzgerald and got his top choices of where he wants to be assigned. His choices are as follows:
>
> 1. Corporal anywhere on A cycle evenings
>
> 2. Detective working Tuesday-Friday (His preference is D1, but definitely NOT in IAB)(Exhibit D)[9]

Fitzgerald alleges that he was replaced by a corporal who was a "(Black male)." (Id. p 9, ¶50). He alleges the corporal had "less time with the Department, less time as Corporal, and was significantly less qualified than Fitzgerald." (Id.). He repeats this disparagement in four of the five counts of the complaint." (Id. pp 10, 12, 15, 19,  ¶¶63, 75, 89, 110) ("a Black officer with less

---

[9] Notably, the email specifically notes that Fitzgerald, who alleges that he was constructively discharged by assignment to District III, was already considering retirement before that assignment occurred.

experience and training than Fitzgerald"). But repetition does not serve to meet the Plaintiff's obligation to plead a plausible claim for relief or as a substitute for allegations of fact that support Fitzgerald's conclusions.

Fitzgerald does not, and cannot allege that he is "more qualified" than any other person assigned to the field training squad. There are no prerequisites to special assignments. All assignments to the training squad are made subject to the discretion of the police chief. (Ex. A, Art. 30.4) ("Employees assigned by the Chief of Police on a full time basis . . .") (Id., Art.11.4(d) and (e)) ("The following squads shall be exempt from the bidding process . . . FTO," "Openings on non-biddable squads . . . shall be posted by the department. Employees desiring transfer or assignment . . . shall request consideration"). Fitzgerald does not allege that he held the assignment as corporal for the training squad by any right or for any term. He does not allege that he was chosen by the police chief on the basis of a comparison between himself and any other employee. He cannot allege any facts which would establish that he was more qualified for a position that did not require specific qualifications. Because the assignments are exempt from the seniority-based bidding system, his time with the department is of no moment.

The allegations that Fitzgerald had "significantly" more training and "more time as a corporal" bear special mention. Fitzgerald's first assignment as a corporal was to the training squad "in 2019." (Doc 1, p 3, ¶15). Prior to that he had been a patrol officer and a detective, neither of which is alleged to involve

administrative duties. He had never before served as a corporal. Stout announced Fitzgerald's transfer from the training squad on September 1, 2019. The only inference which can be drawn from those facts is that if the corporal named to the vacancy created by Fitzgerald's transfer had been promoted to corporal the very day he was named to the squad, he at most would have had only eight months less time as a corporal than Fitzgerald had in that assignment. As for "less experience and training," presumably Fitzgerald refers to experience as a trainer. But he was on the training squad for no more than eight months before he was replaced. He alleges he served as an FTO before but that was before 2012, at least seven years before he was chosen to assist Doane. He was not an FTO in 2019 when he went to the specialty squad. There is in fact no requirement stated in the contract or any other source that requires the training squad corporal to be an FTO. However, Fitzgerald pleads conclusion not fact. He does not allege whether and how long the corporal had served as an FTO before he was assigned as the District II training corporal.

Fitzgerald brings this suit because the probationary police officer who was given a suspension of her evaluations for however long it would take the Training Squad to schedule her training, and the corporal who received the assignment that Fitzgerald was transferred out of, were both African-American by ethnicity. He alleges that Stout ordered the suspension of the probationary officer's daily evaluations until she received remedial training because her race was African-American. He does not allege that any other similarly situated

probationary officer was denied such a suspension. He seeks the inference that when he "objected" to this alleged breach of protocol, he was objecting to discrimination based on race and solely because he objected, he was transferred from the training squad and his "place" on that specialty squad was assigned to a corporal who was an African-American.

As proof of race-based and retaliatory animus Fitzgerald allege: (1) The day before he removed Fitzgerald and the training sergeant from the training squad, (who were "responsible for the daily operations of the squad, while insuring the FTOs and probationary officers were in compliance with program guidelines,") Stout allegedly "[told the training sergeant that she] needed to get on board with the Mayor's agenda to hire and promote more black officers." (Doc 1 p 7, ¶39), (2) Stout allegedly explained to Fitzgerald after he had been transferred that the Police Chief "wanted more diversity on the FTO squad and had instructed the captains and assistant chiefs to look for opportunities to replace White Police Officers with Black Police Officers in order to increase the diversity of the department," and (3) the Police Chief didn't need "justification" or any other excuse to  transfer Fitzgerald or anyone else from the training squad.

**IV.    The complaint fails to state a claim upon which relief may be granted for discrimination based on race under Title VII or 42 U.S.C. § 1981 (Counts I and IV).**

The elements of race discrimination claims under § 1981 and Title VII are the same and therefore need not be analyzed separately. James v. City of Montgomery,

823 Fed. Appx. 728, 732 (11th Cir. 2020). Under either statute, a plaintiff may prove discriminatory intent by direct or circumstantial evidence. Jefferson v. Sewon America, Inc., 891 F.3d 911, 921 (11th Cir. 2020).

Direct evidence is evidence that reflects a discriminatory attitude correlating to the discrimination or retaliation complained of by the employee. Fernandez v. Trees, Inc., 961 F.3d 1148, 1156 (11th Cir. 2020). ("New policy in the company: no more Cuban people" was not direct evidence in case alleging a discriminatory termination). "Only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence." (Id.). Fitzgerald does not plead direct evidence. Fitzgerald alleges that Stout told Fitzgerald's superior that she needed to "get on board" with the mayor's agenda to hire and promote African-American police officers and then accused her of failing all probationary African-American officers in District II; the Police Chief had directed assistant chiefs and captains to look for "opportunities" to replace white officers with black officers; and Stout told Fitzgerald that he had been transferred because of diversity. None of these statements is direct proof of a discriminatory intention to provide an African-American with an advantage in training that is denied to officers who are of an ethnicity other than African-Americans, or to create opportunities for African-Americans by displacing white officers.

Fitzgerald may plead a circumstantial case of race discrimination by showing (1) he is a member of a protected class, (2) he is qualified for the position, (3) he was subject to an adverse employment action, and (4) the employer treated a similarly

situated person outside the plaintiff's protected class more favorably. James, 823 Fed.

Appx. At 732 (internal citations omitted). Fitzgerald does not meet this burden

because he alleges no similarly situated employee outside of his protected class who

was treated better than he. The corporal who was assigned to the training squad after

Fitzgerald was transferred off of it is not alleged to have been paid more than

Fitzgerald or other otherwise treated better than him.

With respect to his claim of discrimination, the only adverse employment

action Fitzgerald alleges is his transfer from the training squad. He does not allege

that any other similarly situated employee was not removed from the training squad,

or any other assignment or position. He alleges that both he and his sergeant were

transferred at the same time. He does not allege the sergeant's race or the race of the

person who replaced her. Both Fitzgerald and the sergeant objected to what they

believed to be a breach of the training protocol.

Fitzgerald alleges that the Police Chief "had instructed the captains and

assistant chiefs to look for opportunities to replace [white police officers with black

officers] in order to increase the diversity of the department." (Doc 1 p 8, ¶45). To

the extent that Fitzgerald argues that this instruction should be read as a directive to

create openings by purging white officers, he offers no facts which would allow that

inference. The Police Chief needed no "justification" to assign an officer to the

training squad or to transfer an officer from it. He could have removed Fitzgerald or

any other officer on the squad any time he wanted. Indeed, he did not have to

appoint Fitzgerald in the first place and in doing so he would seem to have missed an opportunity to provide diversity.

To attribute Fitzgerald's transfer to a desire to appoint an African-American to the training squad one must consider as coincidence the captain's desire for diversity on the training squad occurring immediately after a contentious meeting in which, according to Fitzgerald, the training sergeant who, with Fitzgerald was charged with the day-to-day operations of the training squad, Stout alleged that District II was failing "all of the Black Probationary Officers." (Id. p 7, ¶39). The sergeant told Stout "they had to follow the [training program's] guidelines," i.e., they should have evaluated P.O. on that day's shift even though she had not received remedial training everyone agreed she needed. (Id.). Taking that allegation as true, the sergeant was repeating an objection to the captain's order that already had been rejected in a conference call that occurred because the sergeant and Fitzgerald had informed their lieutenant that Stout's order violated protocol. (Id., ¶36). Immediately after this meeting, the sergeant conveyed to Fitzgerald that she believed she would be transferred from the training squad. (Id., p 7, ¶39). She was expressing this opinion to the very author of the contention that providing a probationary officer enough time to receive overdue training is a violation of protocol.

When Fitzgerald first asked why he was being transferred, Stout said he "wanted to go in a different direction." (Id. p 8, ¶42). Stout "admitted that Fitzgerald had done nothing wrong and had no performance issues that justified the demotion and transfer." (Id.). There was no demotion. Stout did not need justification or

cause. Fitzgerald alleges that in a meeting whose purpose was to discuss "the issue of where he was to be assigned," he asked Stout a second time why he was being transferred and was told that "he had done nothing wrong but was simply transferred out for the sake of diversity." (Id., ¶¶44, 45).

Additionally, Fitzgerald's claim must fail because he does not allege an adverse employment action. To be sure, he lost the $230 per month payment that all members of the training squad received for performing additional duties, but he also was relieved of those duties. He alleges no loss of prestige flowing from membership on the training squad. In order to constitute an adverse employment action in a discrimination or retaliation suit a plaintiff must show a serious and material adverse change in the terms, conditions, or privileges of work. Jackson v. Hall County Government, 518 Fed. Appx. 771, 773 (11th Cir. 2013) (Change in shift assignments was not a basis for discrimination or retaliation suit). Although Jackson involved no loss of a special payment, neither did the change come with lesser duties.

## V.    The complaint  does not plausibly allege a claim for constructive discharge.

In Count II of the Complaint, the Plaintiff attempts to plead constructive discharge as a separate claim for relief. While constructive discharge is an adverse employment action that would serve to establish an element of a discrimination case, it is not itself a cause of action. Bryant v. Skyline Props., Inc., 2006 WL 708647, at *2 (N.D. Tex. 03/20/2006). Count II of the complaint therefore must be dismissed. Additionally, however, the complaint does not plausibly allege a constructive discharge.

> A constructive discharge occurs when a discriminatory employer imposes working conditions that are 'so intolerable that a reasonable person in [the employee's] position would have been compelled to resign.'" "Part of an employee's obligation to be reasonable is an obligation not to assume the worse, and not to jump to conclusions too fast." The threshold "is quite high."

Beltrami v. Special Counsel, 170 Fed. Appx. 61 (11th Cir. 2006) (Internal citations and emphasis removed).

Contrary to Fitzgerald's allegations, he was neither demoted nor transferred out of District II. To the contrary, after Stout announced Fitzgerald's transfer from the training squad, Stout offered him a position as a corporal in District II on a school resource officer squad. Fitzgerald does not allege that this assignment would be so insufferable as to force him to end his 17 year career. He just "didn't want to be a School Resource Officer." He requested a specific assignment as a detective but was told it was not available.  He was then asked to list his preferences and he did so, allegedly putting District III last. He in fact did not do that (and putting the district as his last choice is not the same thing as saying the district was a dangerous place for him). The list (Ex. D) not only does not express an unwillingness to work in District III or any other district—he would take a corporal's position on a specified shift in any district or a detective position in any district so long as he was not assigned to IA)—but also informed Stout that Fitzgerald already was contemplating retirement before he was assigned to District III. Finally, Fitzgerald's claim of constructive discharge is that he was "essentially forced to retire in order to avoid working in this dangerous environment." Fitzgerald was not constructively discharged.

**VI.    The complaint fails to state a claim for retaliation in violation of Title VII or 42 U.S.C. 1981 (Counts III and V).**

Claims for retaliation brought under Title VII or 42 U.S.C. § 1981 are assessed against the same standard and do not require separate treatment by the Court. James, 823 Fed. Appx., at  734. Counts III and IV of the complaint travel on common or repeated allegations. In order to establish a prima facie case of retaliation, "a plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1454 (11th Cir. 1998). For the reasons argued above, Fitzgerald has not pled an adverse employment action. More importantly, he did not engage in activities protected by any law.

Upon learning that his captain had ordered the suspension of a probationary officer's evaluation, he objected and informed his sergeant and lieutenant that this order, "was a violation of protocol." (emphasis added) (Doc 1 p 14, ¶87; p 19, ¶108). He claims that because he objected about the captain's "favorable treatment to [the probationary officer] on account of her race," he was told he would be transferred from the training squad. Although the race of the person who was assigned to the training squad in his place is of no moment to a claim for retaliation, he nevertheless pleads in both counts addressing retaliation that he was replaced by a "Black officer with less experience and training" than he, and "essentially forced to retire in order

22

to avoid working in dangerous environment." (Id., ¶¶89, 90, 109, 110, 111). He alleges no facts which establish the danger which he pleads by conclusion.

The protected activity that is protected by Title VII is explicitly stated, in 42 U.S.C. § 2000-3, which provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter. (emphasis added).

The practices to which the quoted language refers include 42 U.S.C. § 2000e-2(a), which provides:

> It shall be an unlawful employment practice for an employer –
> (1) to fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin or
>
> (2) to limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee because of such individual's race, color, religion, sex or national origin. (emphasis added).

The protection against retaliation read into 42 U.S.C. § 1981 is defined by § 1981(c), which prohibits the impairment of the rights the law protects. Those rights are clearly described as the denial to any person on the basis of race his her right to make and enforce contracts :

> (a) Statement of equal rights
>
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and to no other.

Fitzgerald complained that the assistant chief violated the department's training protocol by allowing an African-American probationary officer to take remedial training—that Fitzgerald had two days earlier said would help improve her performance—before her performance was the subject of an evaluation that, in Fitzgerald's mind, posed an eminent threat to the officer's continued employment. He does not complain that any other probationary officer had been denied similar accommodation. Nowhere in the Complaint does Fitzgerald allege that he opposed discrimination made unlawful by Title VII, i.e. discrimination against any person protected by that law, or of race-based discrimination that would deny that person an employment opportunity. He describes no person who suffered such discrimination. Neither does he allege that he complained or objected to any person being denied the right to enforce a contract because of his or her race. The only oppositional activity the Plaintiff alleges is his objection to an order that a probationary officer not be evaluated on her performance until she received remedial training that he had been ordered to schedule ten days earlier. It does not matter why the training was not scheduled. It did not get done. He does not allege that he objected to what he believed to be a breach of training protocol that threatened the integrity of the program because the recipient of this "advantage" (which he alleges by implausible conclusion) was African-American, or that the same "advantage" had been denied to a probationary officer that was not an African-American.

What Fitzgerald alleges is that he objects to the Mayor's goal of hiring and promoting more African-American officers and the Police Chief's charge to find

opportunities for African-American officers.  He clearly is against both concepts. His

opposition is not protected by any law prohibiting discrimination.

## **CONCLUSION**

For the foregoing reasons, the complaint should be dismissed.

## **LOCAL RULE 3.01(G) CERTIFICATION**

The undersigned counsel has conferred with counsel for the Plaintiff regarding

this motion.  The Plaintiff opposes the relief requested.

Respectfully submitted,

/s/ Thomas M. Gonzalez
Thomas M. Gonzalez
Florida Bar No. 192341
GrayRobinson, P.A.
P.O. Box 3324
Tampa, Florida 33601-3324
Telephone: (813) 273-5000
Facsimile: (813) 273-5145
thomas.gonzalez@gray-robinson.com
Attorneys for the Defendant

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

furnished this 4th day of June, 2021, by CM/ECF electronic filing to the Clerk of

Court and to the following:

Gary L. Printy, Jr.
Printy & Printy, P.A.
3411 W. Fletcher Avenue, Suite A
Tampa, Florida 33618
garyjr@printylawfirm.com

/s/ Thomas M. Gonzalez
Attorney

25